RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0149p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

———————————

JAMES SWAIN RIEVES, et al.,

*Plaintiffs-Appellees*,


*v.*


TOWN OF SMYRNA, TENNESSEE, et al.,

*Defendants*,


JENNINGS S. JONES (19-5319); JOHN ZIMMERMAN (19-5320); MIKE FITZHUGH (19-5347),

*Defendants-Appellants*.

Nos. 19-5319/5320/5347

———————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:18-cv-00965—Aleta Arthur Trauger, District Judge.

Decided and Filed: May 15, 2020

Before: GIBBONS, KETHLEDGE, and BUSH, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:** Heather C. Ross, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant Jennings Jones. William T. Ramsey, Blind Akrawi, NEAL & HARWELL, PLC, Nashville, Tennessee, for Appellant John Zimmerman. Nicholas C. Christiansen, Roger W. Hudson, Daniel W. Ames, HUDSON, REED & MCCREARY, PLLC, Murfreesboro, Tennessee, for Appellant Mike Fitzhugh. Frank Brazil, BRAZIL CLARK, PLLC, Nashville, Tennessee, Christopher W. Smith, DAVID RANDOLPH SMITH & ASSOCIATES, Nashville, Tennessee, for Appellees.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge.   On February 12, 2018, law enforcement officials in Rutherford County, Tennessee, executed "Operation Candy Crush."  Officials raided certain stores within the county selling legal cannabidiol ("CBD") products and arrested their owners.  The seventeen store owners alleged that law enforcement violated their constitutional rights to be free from false arrest, unlawful seizure, and unlawful prosecution, as well as their right to equal protection.  They also alleged a civil conspiracy to violate those rights.  In support of their complaint, the plaintiffs attached documents revealing communications between law enforcement officials leading up to Operation Candy Crush in which officials expressed doubts about the CBD products' purported illegality and concerns regarding the planned arrests and raids.  The defendants moved to dismiss the claims pursuant to Federal Rule of Civil Procedure 12(b)(6), claiming absolute and qualified immunity.  The district court denied their motions.

District Attorney Jennings Jones and Assistant District Attorney John Zimmerman claim they are entitled to absolute prosecutorial immunity or qualified immunity for their alleged misconduct during the investigation of the plaintiffs' CBD products.  Mike Fitzhugh, the Rutherford County Sheriff, similarly claims he is entitled to quasi-judicial absolute immunity and qualified immunity for his actions related to the investigation and arrests of the plaintiffs.  For the following reasons, we affirm the district court's denial of absolute and qualified immunity to Jones and Zimmerman, affirm the denial of quasi-judicial and qualified immunity to Fitzhugh for his alleged Fourth Amendment violations, and reverse the denial of qualified immunity to Fitzhugh with respect to the plaintiffs' equal protection claim.

I.

The seventeen plaintiffs in this case are all citizens and residents of Rutherford County, Tennessee.[1]  The plaintiffs each owned and operated businesses, including convenience stores,

---

[1]Because this appeal arises from a motion to dismiss, we presume all facts the plaintiffs allege in the complaint are true.  *See Prince v. Hicks*, 198 F.3d 607, 609 (6th Cir. 1999).

tobacco stores, and "vape shops," selling a range of tobacco and related products.  Each of the plaintiffs' stores sold industrial hemp-derived products containing CBD.**2**  During the relevant period, hemp-derived products containing CBD were, and continue to be, legal under Tennessee and federal law.  Tenn. Code Ann. § 39-17-402(16)(D) (2017) ("Marijuana does not include: . . . [i]ndustrial hemp as defined in § 43-26-102.").

From February 2017 through February 2018, the Rutherford County Sheriff's Office ("RCSO") investigated the sale of CBD products in Rutherford County.  The investigation began when two plaintiffs promoted the sale of "100% legal CBD products" on their store's Facebook page.  DE 5-2, Ex. 2, PageID 73.  After seeing the advertisement, an undercover RCSO officer**3** purchased CBD products from the store in February 2017 and then submitted those products to the Tennessee Bureau of Investigation ("TBI") for lab testing.

RCSO officers received the results in May 2017.  The lab report indicated that the product contained CBD, which the report listed as a Schedule VI substance.  After receiving the first lab report, several RCSO officers met with Assistant District Attorney John Zimmerman to seek "advice" and "prosecutorial direction on the case."  *Id.*; DE 5-1, Ex. 1, PageID 49.  The officers were concerned by the lab report stating CBD was a Schedule VI substance even though they could not find it listed as such under Tennessee statutes.  At the meeting, Zimmerman called the TBI to discuss the lab results and "assured [the officers] CBD was an illegal Schedule [VI] product and that it needed to be prosecuted."  DE 5-1, Ex. 1, PageID 50; DE 5-2, Ex. 2, PageID 73.  Notably, an officer informed Zimmerman that Amazon, the online retailer, was also selling similar CBD products.  Zimmerman laughed in response and said, "we aren't going aft[er]

---

**2**"'Industrial hemp' . . . [m]eans the plants . . . of the genera cannabis that do not contain a delta-9 tetrahydrocannabinol (THC) concentration more than [0.3%]" and "[i]ncludes any industrial hemp-derived products that do not contain more than [0.3% THC] in a topical or ingestible consumer product."  Tenn. Code Ann. § 43-26-102(4) (2017).  So long as the industrial hemp is "procured through a grower or processor licensed by the department [of agriculture]," it is not considered illegal marijuana under Tennessee law.  *Id.* § 43-26-103(c) (2017). CBD products derived from the marijuana plant are generally illegal if they do not meet a specific exemption.  *See id.* § 39-17-402(16) (2017).

**3**Most of the officers assigned to this case were not identified in the pleadings or exhibits.  The RCSO exhibits identify the officers using anonymous abbreviations such as "N.D."  The complaint, therefore, does not specify which factual allegations correspond to the officers other than the named officers.  The named officers relevant to this appeal are Sheriff Mike Fitzhugh and Major William Sharp, the author of the investigation summary on Operation Candy Crush.

Amazon." DE 5-2, Ex. 2, PageID 75. He instructed the officers to make more purchases of CBD products from similar vape stores, including from outside the city of Murfreesboro, and to photograph their purchases.

RCSO officers continued to express their concern regarding CBD's purported illegality. An officer "sought legal advice from prosecution" regarding CBD's legal status and spoke with Zimmerman several times "for clarity." DE 44, SAC, PageID 317 (citing DE 5-2, Ex. 2, PageID 73). Although in these instances the officer "could not get clarity" from Zimmerman, the notes further state that Zimmerman recommended padlocking the businesses because they were "selling illegal products." DE 5-2, Ex. 2, PageID 73. An officer also spoke with District Attorney Jones who told him the CBD products were "definitely illegal." DE 44, SAC, PageID 317 (citing DE 5-2, Ex. 2, PageID 74). In addition to their doubts about CBD's legality, RCSO officers expressed concern about Zimmerman's plan to padlock the stores and seize their assets, which they felt seemed "extreme." DE 5-2, Ex. 2, PageID 75.

In early December 2017, Zimmerman called RCSO Major William Sharp. Zimmerman told Sharp to get a certain detective "more involved" in the investigation of the CBD products as "a lot needed to be done." DE 5-4, Ex. 4, PageID 77. He also told Sharp they "needed to move quickly," "wanted to [present] this case to the February Grand Jury," and needed to "have this done before (something about legislation) [occurred]."[4] *Id.* "[L]ater in December or first part of January," Jones also called Sharp to direct the certain detective to "take a more active approach" in the investigation. *Id.* Following these conversations, Sharp made the investigation a "priority case." *Id.*

The plaintiffs point to a December 17, 2017, email from Zimmerman to various TBI employees as evidence that Zimmerman knew the TBI lab reports did not conclude the tested CBD products were illegal. In that email, titled "lab reports," Zimmerman summarized various lab results and inquired why one test was "inconclusive" and in another the test "found [the

---

[4]The plaintiffs allege that Zimmerman wanted to accelerate the investigation prior to the adoption of Senate Bill 2224 which, in relevant part, would have amended Tennessee's civil forfeiture laws to specifically exclude CBD products. The bill was introduced on January 31, 2018, approximately two weeks before the RCSO executed the arrests and raids of the plaintiffs, known as "Operation Candy Crush."

product] to be Cannabidiol, BUT did not list it as a schedule VI substance."  DE 5-3, Ex. 3, PageID 76.  Additionally, he wrote: "Before we indict these owners of businesses, and padlock their businesses, we want to make sure we are understanding what is being offered for sale. Police say we have about 20 businesses and I want to make sure we are on the same page as the expert chemists."  *Id.*

On January 11, 2018, an RCSO officer attended a meeting with TBI employees, Zimmerman, and another Assistant District Attorney.  The meeting was intended for the TBI to clarify whether the CBD products tested were illegal.  The TBI stated that CBD was a Schedule VI substance, but the employees clarified that they could not determine the products' legality because the TBI lacked the equipment to test the percentage of THC, preventing them from determining legality.[5]  A TBI attorney explained that determining the legality of a substance containing CBD is a "case[-]specific" inquiry.  DE 5-1, Ex. 1, PageID 51.  In response, Zimmerman turned to the RCSO officer and said, "this stuff is illegal and we are going forward with this."  *Id.*  The officer felt "shut down" by Zimmerman and was "not comfortable" with the case because "no one ha[d] explained how [the CBD products] w[ere] illegal."  *Id.*; DE 5-4, Ex. 4, PageID 77.  The next day, the officer who had attended the meeting called Sharp and informed him the "[TBI] [did] not feel comfortable testifying about the [CBD products' legality]."[6]  DE 5-4, Ex. 4, PageID 77.  Sharp subsequently told the officer "not to make any further buys and to stop any further investigation until [he could] get some answers."  *Id.*

Sharp came to believe the investigations should be postponed.  On January 22, 2018, Sharp advised his supervisors, including Sherriff Mike Fitzhugh, that he was not comfortable proceeding with the case until he had more information.  On January 24, 2018, Sharp called Jones to relay his concerns regarding the undercover purchases and plan to raid the stores, and he further noted that the TBI had concerns as well.  Jones apparently became "upset" about the comments regarding the TBI's testing limitations and reiterated that the products contained a scheduled substance.  *Id*.  The same day, Jones emailed Zimmerman and Sharp to explain to

---

[5]Tenn. Code Ann. § 43-26-102(4) (2017) provides that hemp-derived CBD products with less than 0.3% THC are legal.

[6]This account of the meeting is consistent with TBI's later press release on the matter.

Zimmerman that Sharp was concerned about indicting the plaintiffs and seizing their property and then having the TBI "refuse[] to testify that the substances [sold were] illegal." DE 5-6, Ex. 6, PageID 84. Around one week later, on January 30, 2018, Sharp called a TBI agent and again did not receive any assurances about the legality of the products being sold. As of January 30, Sharp noted that "no one [in the RCSO was] comfortable moving ahead" with Operation Candy Crush. DE 5-4, Ex. 4, PageID 78.

Because of Sharp's delay, the District Attorney's office met with Sherriff Mike Fitzhugh and two other Chiefs—supervisors to Sharp and the other RCSO officers—to speed up the investigation. Fitzhugh would not override Sharp's decision but helped arrange further meetings between the prosecutors and officers for early February.

On February 1, 2018, Sharp met with Jones to discuss the CBD investigations. Sharp told Jones that he thought they should not move forward given his concerns about the legality and source of the products. Jones responded that the CBD products were Schedule VI substances and illegal, and he added that the TBI was on board with the case.

A "contentious" meeting took place the next day, February 2, 2018, between Sharp, RCSO officers, Jones, Zimmerman, and another Assistant District Attorney. DE 5-1, Ex. 1, PageID 52; DE 5-4, Ex. 4, PageID 78. Sharp and other officers reiterated their concerns. Zimmerman shared the Tennessee statute the store owners were allegedly violating. In response to concerns about the choice to raid the businesses and seize their property through civil forfeiture, Zimmerman said: "They will come in on their court date, plead guilty, pay the fines[,] and get their businesses open. . . . We will put off the court dates, attorneys will get tired of coming to court and settle." DE 44, SAC, PageID 319; DE 5-4, Ex. 4, PageID 78.

As a result of the meeting, Operation Candy Crush was executed on February 12, 2018. The plaintiffs were arrested and charged with violating the Tennessee Drug Control Act, Tenn. Code Ann. § 39-17-417. A judge granted temporary injunctions and issued orders to padlock the stores based on "Petition[s] for Abatement of Nuisance" filed by Zimmerman and Jones. DE 44, SAC, PageID 324. The petitions stated that the plaintiffs sold edible products that were laced with marijuana extracts and "packaged as gummy worms or gummy bears." *Id.* The plaintiffs

claim these allegations are false. Moreover, the plaintiffs allege that the "lock down orders" were based on affidavits with the erroneous statement that TBI "determined the candy had been laced with 'CBD,'" and filings that omitted an amendment to one of the TBI lab reports removing the scheduling designation. *Id.* at 324–25.

The same day Operation Candy Crush was executed, leading law enforcement officers, including Jones and Fitzhugh, staged a televised press conference in front of one of the plaintiffs' stores. Fitzhugh remarked that the "[RCSO] and Smyrna Police Department had 'conducted raids' on 23 stores for selling products 'containing a marijuana derivative.'" *Id*. at 322. Fitzhugh also claimed at the press conference that the plaintiffs took candies out of their packaging, "spray[ed]" and "infuse[d]" the candy with illegal substances, then repackaged them to sell at a marked-up price. *Id*. Jones also spoke at the press conference, claiming that the "TBI ha[d] certified that [CBD] [wa]s a Schedule VI controlled substance." *Id.* at 323.

All charges against the plaintiffs were eventually dismissed and expunged. The day after the raids and press conference, an attorney representing manufacturers of CBD products called Zimmerman and explained to him that the products were legal under Tennessee and federal law. Jones, meanwhile, called Sharp on February 23, 2018, discussed their potential civil liability, and also said the following: "Fucking T.B.I. refuses to testify in court over the results. . . . T.B.I. said in the meeting they were good with it. . . . I'll [do a press release and] throw T.B.I. under the bus, they fucked us." DE 5-4, Ex. 4, PageID 78–79. On February 28, 2018, Jones issued a press release that blamed the TBI for the false arrests. Jones claimed that his office initiated actions against the plaintiffs "because the TBI assured us that the items being sold . . . were infused with illegal controlled substances." DE 5-8, Ex. 8, PageID 94. Jones said the TBI's lab reports were the "foundation of all indictments and nuisance actions in this case." *Id.*

The TBI rejected Jones's allegations. Its statement provided that "it is inaccurate for the local stakeholders in these cases to assert they made decisions in this case unaware of the limits of our forensic work." DE 5-9, Ex. 9, PageID 129. It explained the TBI "make[s] no determination of the legality of situations involving the evidence [they] examine" and its scientists are "rarely aware of the circumstances involving the evidence submitted for analysis," including the origins of the substances. *Id.* at 129–30. Regarding the CBD products tested, the

TBI could not determine whether they originated from legal, industrial hemp, or from illicit marijuana—their equipment is incapable of such a determination. The TBI claimed that it "clearly explained—in detail—the limitations of [its] analysis to all stakeholders." *Id*. at 130. The determination about the legality of the CBD products, the TBI claimed, was made "solely . . . by the local agency and District Attorney General." *Id*.

The plaintiffs filed a complaint asserting claims under 42 U.S.C. § 1983 and 1985, alleging violations of their Fourth and Fourteenth Amendment rights, as well as a conspiracy to violate those rights. Count I alleged violations of their Fourth Amendment rights to be free from false arrest, unlawful seizure, and unlawful prosecution. Specifically, and relevant to this appeal, the plaintiffs alleged that Jones and Zimmerman "undertook investigatory functions usually conducted by police" and "pushed law enforcement agencies to move [Operation Candy Crush] forward, despite the serious and legitimate concerns raised by the investigating police officers," and despite the defendants being aware of the "serious risk" that the plaintiffs' conduct was legal. DE 44, SAC, PageID 329–30. Count II alleged violations of the Fourteenth Amendment's Equal Protection Clause, claiming that the defendants selectively targeted the plaintiffs "because they were small business owners, rather than large commercial operations such as Amazon or Wal-Mart" who sold the same CBD products but were "unlikely to be as easily intimidated into paying fines and agreeing to forfeit property." *Id.* at 330. Count III alleged a conspiracy to violate the plaintiffs' Fourth Amendment rights, based on Jones and Zimmerman's agreement with law enforcement to push Operation Candy Crush forward despite lacking probable cause, and on Fitzhugh's agreement to allow it to move forward despite objections by his subordinates.

Jones, Zimmerman, and Fitzhugh each filed motions to dismiss. The district court denied all three motions. The district court rejected Jones and Zimmerman's arguments that they are entitled to absolute prosecutorial immunity or, alternatively, qualified immunity for their actions during the investigation. The district court also rejected Fitzhugh's arguments regarding Count I that the plaintiffs failed to state a claim against him in his individual capacity for which relief may be granted, and it rejected his alternative claims to quasi-judicial and qualified immunity. The court further denied dismissal of the equal protection claim against Fitzhugh. Jones, Zimmerman, and Fitzhugh filed timely notices of appeal. Their appeals were consolidated.

II.

"We review de novo a dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, construing the complaint in the light most favorable to the plaintiff and accepting as true all well-pleaded factual allegations." *Prince v. Hicks*, 198 F.3d 607, 611 (6th Cir. 1999) (citing *Merriweather v. City of Memphis*, 107 F.3d 396, 398 (6th Cir. 1997)). We review denials of absolute and qualified immunity de novo. *Id.*; *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011).

III.

The complaint offers very specific factual allegations that Jones and Zimmerman acted outside their role as judicial advocates during the investigative phase of Operation Candy Crush and were objectively unreasonable in pushing the operation forward without probable cause. Therefore, we conclude they are not entitled to absolute or qualified immunity. Fitzhugh is not entitled to quasi-judicial immunity because he has not shown that absolute immunity extends to execution of a tainted court order based on false information, as the complaint alleges. Fitzhugh, moreover, is not entitled to qualified immunity on the plaintiffs' Fourth Amendment claims because the complaint alleges that he knew or should have known that probable cause did not exist to arrest the plaintiffs. Fitzhugh is, however, immune on the equal protection claim because the complaint does not allege facts showing that he participated in the decision to selectively target the plaintiffs' stores.

The defendants' only challenge to the conspiracy claim is the alleged lack of an actionable, underlying constitutional violation. Because the plaintiffs have alleged actionable violations by each defendant, the conspiracy claim may proceed.

A.

1.

Supreme Court precedent requires we apply a "functional approach" to determine whether a government official is entitled to absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). We must consider

"the nature of the function performed, not the identity of the actor who performed it."  *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).  The law presumes that qualified immunity—rather than absolute immunity—applies, and "the official seeking absolute immunity bears the burden of showing that [absolute] immunity is justified for the function in question." *Burns*, 500 U.S. at 486.  Courts have thus been "quite sparing" in extending absolute immunity to state actors in the § 1983 context.  *Buckley*, 509 U.S. at 269 (quoting *Forrester*, 484 U.S. at 224).

"A prosecutor is entitled to absolute immunity when [he] acts 'as an advocate for the State' and engages in activity that is 'intimately associated with the judicial phase of the criminal process.'" *Prince*, 198 F.3d at 611 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976)). Absolute immunity extends to a prosecutor's conduct in "initiating a prosecution and in presenting the [government]'s case." *Imbler*, 424 U.S. at 431.  This includes the "administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997).  For example, a prosecutor is entitled to absolute immunity for his participation in a probable cause hearing or in filing an information. *Burns*, 500 U.S. at 492 (probable cause hearing); *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (filing an information).

Absolute immunity does not, however, extend to a prosecutor's administrative and investigative conduct that "do[es] not relate to [his] preparation for the initiation of a prosecution or for judicial proceedings." *Buckley*, 509 U.S. at 273 (citing *Burns*, 500 U.S. at 494–96).  In other words, absolute immunity does not protect "the investigative functions normally performed by a detective or police officer." *Id*.  As a hypothetical example, the Court in *Buckley* wrote that a prosecutor who "plans and executes a raid on a suspected weapons cache" is not entitled to absolute immunity.  *Id.* at 274.  A prosecutor who "search[es] for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested" is not entitled to absolute immunity.  *Id*. at 273; *see also id.* at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.").  While the existence of probable cause can help inform a court's determination that the prosecutor was

acting as an advocate, the key inquiry still depends on whether the conduct at issue is intimately connected to the judicial process.

Moreover, the fact that a prosecutor "later call[s] a grand jury to consider the evidence [that his alleged misconduct uncovered] does not retroactively transform that work from the administrative into the prosecutorial." *Id.* at 275–76. "A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, . . . that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Id.* at 276.

Absolute immunity also does not apply to the prosecutorial function of giving legal advice to police "as part of the investigative or administrative phase of the criminal case." *Prince*, 198 F.3d at 614; *see also Burns*, 500 U.S. at 496 (denying absolute immunity to a prosecutor who advised officers regarding the legality of interviewing a suspect by hypnosis). More specifically, this court held absolute immunity did not apply to a prosecutor's advice to law enforcement regarding the existence of probable cause. *See Prince*, 198 F.3d at 615. A prosecutor's advice to law enforcement regarding probable cause for an arrest is not protected by absolute immunity because such advice "ha[s] only an attenuated connection to the judicial phase of the criminal process." *Id.* at 615. Beyond advising police, a prosecutor is not entitled to immunity for *instructing* police to arrest a suspect based on his own independent impressions of probable cause. *Harris v. Bornhorst*, 513 F.3d 503, 510–11 (6th Cir. 2008).

Jones and Zimmerman are not entitled to absolute immunity because their alleged conduct at issue—directing the RCSO's investigation, advising the RCSO regarding the legality of the CBD products, and propelling the officers to execute Operation Candy Crush—occurred prior to the initiation of judicial proceedings and without probable cause.[7]    Although Zimmerman was more involved in the activities related to the investigation, both Zimmerman and Jones participated in the investigation leading up to the execution of Operation Candy Crush,

---

[7]The plaintiffs do not dispute that Jones and Zimmerman's conduct involving presenting evidence to the grand jury and obtaining civil forfeiture is entitled to absolute prosecutorial immunity.

both advised the officers regarding the legality of the products at issue, and both were at least partly responsible for effectuating the arrests of the plaintiffs and the raids of their stores.

Zimmerman engaged in various investigative activities prior to the execution of Operation Candy Crush. First, he requested that the RCSO make more undercover purchases from stores in Rutherford County and photograph those purchases, and he even added geographical instructions to also make purchases outside the city of Murfreesboro. He told the RCSO officers not to investigate Amazon but to focus on vape stores. He asked Sharp to get a certain detective more involved in the investigation. He told Sharp that the investigation needed to move quickly. He, along with others, tried to circumvent Sharp's postponement of the investigation by going directly to Sharp's superior, Fitzhugh, to push the investigation forward. Unlike a probable cause hearing or the filing of an information, none of these activities are intimately related to the initiation of judicial proceedings or Zimmerman's role as an advocate.

Zimmerman's role in directing the CBD investigation is similar to the example used by the Court in *Buckley* of "plan[ning] and execut[ing] a raid on a suspected weapons cache." 509 U.S. at 274. By directing officers to make CBD purchases to then submit for testing, Zimmerman was "search[ing] for the clues and corroboration that might give him probable cause to recommend that [other storeowners] be arrested." *Id.* at 273. Thus, Zimmerman "has no greater claim to [absolute] immunity than [the] police officers allegedly acting under his direction." *Id.* at 274 (quotation omitted).

Jones, to a lesser degree, also helped direct the investigation. Sometime in either December 2017 or early January 2018, Jones allegedly called Sharp to ask that a certain detective "take a more active approach in the investigation," and this call influenced Sharp to make the investigation a priority. DE 5-4, Ex. 4, PageID 77. Moreover, in January 2018, Jones allegedly grew dissatisfied with Sharp's hesitations over the case and went over Sharp's head directly to his supervisors, intending to speed up the investigation. Construing the complaint in the light most favorable to the plaintiffs, this conduct was designed to influence the nature of the investigation and was unrelated to Jones's role as an advocate. The conclusion that Jones and Zimmerman's conduct was investigative is bolstered by the fact that it occurred prior to the

execution of Operation Candy Crush and prior to the initiation of any judicial proceedings. *See Prince*, 198 F.3d at 612–13.

Jones and Zimmerman's advice to the RCSO officers that the CBD products were illegal also is not protected by absolute immunity because it was given during the investigative phase of Operation Candy Crush. Like the prosecutor in *Burns*, Jones and Zimmerman allegedly offered their advice prior to the initiation of any judicial proceedings. As early as May 2017, Zimmerman told RCSO officers that the CBD products were illegal. Zimmerman offered this advice to justify further investigation into other stores selling CBD products. Jones also allegedly advised RCSO officers on February 1, 2018, prior to the execution of Operation Candy Crush, that the CBD products were illegal. "[A]dvising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process' that it qualifies for absolute immunity." *Burns*, 500 U.S. at 493 (quoting *Imbler*, 424 U.S. at 430).

Jones and Zimmerman's conduct falls directly within *Prince*'s holding that advising law enforcement regarding the existence of probable cause is not protected by absolute immunity. 198 F.3d at 614. Because the purported illegality of the CBD products was the only basis for probable cause, Zimmerman and Jones advised the RCSO officers regarding the existence of probable cause and, like the prosecutor in *Prince*, they are not entitled to absolute immunity for such advice.

Jones hangs his argument regarding absolute immunity on the claim that, contrary to the prosecutor in *Burns*, he had already decided to prosecute the plaintiffs prior to all of the alleged conduct at issue. This sweeping defense, Jones argues, immunizes him for conduct undertaken months prior to initiating the "planned" prosecution. Moreover, Jones argues that once a decision to prosecute was made, any advice he gave after that time was in his role as an advocate. Jones's argument fails for several reasons.

First, Jones's reliance on *Prince* is misplaced. Although part of *Prince*'s rationale was that the prosecutor gave advice to law enforcement prior to "[her] *determination* that she would initiate criminal proceedings," 198 F.3d at 614–15 (emphasis added), the opinion cannot be read

so broadly as to immunize any conduct that occurred after the point at which a prosecutor retrospectively and subjectively claims he "decided" to prosecute. The language Jones highlights was only part of the rationale in *Prince*; the court based its holding on the fact that probable cause did not yet exist at the time of the advice, similar to this case. Moreover, taken in context, the court's reasoning emphasized that the prosecutor had not actually initiated proceedings, rather than that she simply had not yet determined to do so. The court explained that the existence of probable cause is not the dispositive dividing line for determining when absolute immunity applies; rather, "the dividing line is the point at which the prosecutor performs functions that are intimately associated with the judicial phase of the criminal process." *Id.* at 614. This is why, the court explained, "a prosecutor who *initiates* criminal proceedings against a suspect whom she had no probable cause to prosecute is protected by absolute immunity." *Id.* at 614 (emphasis added) (citing *Buckley*, 509 U.S. at 274 n.5). Similarly, the mere decision to prosecute—often determined around the same time as attaining probable cause—does not control whether all of a prosecutor's subsequent conduct is protected by absolute immunity.

This court's later opinion in *Harris*, which offers several parallels to this case, also suggests that *Prince* is not as expansive as Jones proposes. The prosecutor in *Harris* was denied absolute immunity for instructing police to arrest a suspect based on her independent determination of probable cause. 513 F.3d at 510. The advice Jones and Zimmerman gave officers was similarly intended to justify arresting the plaintiffs based on Jones and Zimmerman's independent interpretations of the TBI lab reports. While in *Harris* the prosecution decided to arrest the suspect without input from police, here Jones and Zimmerman even more proactively pushed the officers to execute Operation Candy Crush despite the "persistent concerns" the officers expressed. DE 5-1, Ex. 1, PageID 55. Jones and Zimmerman are therefore not entitled to absolute immunity for pushing officers to execute Operation Candy Crush based on their specious confidence in the lab reports.

Second, Jones's argument that he is entitled to absolute immunity because he had already "decided" to prosecute the plaintiffs conflicts with *Buckley*'s warning that a prosecutor who "later call[s] a grand jury to consider the evidence [that his alleged misconduct uncovered] does

not retroactively transform that work from the administrative into the prosecutorial." 509 U.S. at 275–76. As the Court explained in *Buckley*, "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, . . . that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial." *Id.* at 276. Jones similarly may not immunize his conduct leading up to the execution of Operation Candy Crush by claiming his conduct occurred after his subjective decision to prosecute. Jones acted in an investigative capacity even if he previously decided to prosecute the plaintiffs. The TBI was still issuing lab reports for tested CBD products through the end of January 2018. Therefore, it is appropriate to conclude that when Jones reached out to Sharp to get a detective more involved, and to Fitzhugh in January 2018 to "speed up the investigation" that Sharp was otherwise delaying, Jones was acting as an investigator and not prosecutor.

Courts ought to be "quite sparing" in extending absolute immunity to prosecutors, and the burden is on Jones and Zimmerman to justify extending absolute immunity to the claims against them. *See, e.g.*, *Buckley*, 509 U.S. at 269 (quoting *Forrester*, 484 U.S. at 224). While our case law protects prosecutors when they act as advocates, Jones and Zimmerman have not demonstrated that absolute immunity should also protect their alleged conduct prior to any such prosecution. Because they have not met this burden, we affirm the district court's denial of absolute immunity for their conduct directing the investigation, advising the officers, and pushing officers to execute the arrests and raids despite the officers' concerns.

2.

Having concluded that Jones and Zimmerman are not absolutely immune for their actions during the investigation of the CBD products, we next consider whether they are entitled to qualified immunity. Qualified immunity protects government officials from civil suits for damages, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Qualified immunity shields the official not only from liability but also from the burdens of litigating the suit altogether. *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985). When defendants allege qualified immunity as a defense, the plaintiffs bear the burden of showing that the defendants are not entitled to qualified immunity. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

We employ a two-part test to determine whether a government official is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We consider (1) whether the alleged facts, viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right, and (2) whether that constitutional right was "clearly established." *Id.*; *see also Pearson v. Callahan*, 555 U.S. 223, 232–36 (2009) (holding that the two qualified immunity prongs may be considered in either order). A right is clearly established when a reasonable officer would know—in the given situation and with the information known to him at the time—that his conduct violated that right. *Saucier*, 533 U.S. at 202. If reasonable officials could disagree as to whether the conduct at issue was lawful, then qualified immunity applies.[8] *Waters v. City of Morristown*, 242 F.3d 353, 360–61 (6th Cir. 2001).

First, the plaintiffs have alleged facts demonstrating that Jones and Zimmerman violated their constitutional rights. The relevant constitutional right is the Fourth Amendment right to be free from an arrest without probable cause. Whether an arrest is supported by probable cause is determined by analyzing whether "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information[,] were sufficient to warrant a prudent [person] in believing that [the plaintiffs] had committed or [were] committing an offense." *United States v. Romero*, 452 F.3d 610, 615 (6th Cir. 2006) (first and third alterations in original) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)), *cert. denied*, 549 U.S. 1237 (2007). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Id.* at 615–16 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). A "mere suspicion of criminality" does not sufficiently support a finding of probable cause.

---

[8]The plaintiffs erroneously contend that we do not have jurisdiction to review the reasonableness prong of the qualified immunity analysis because the district court's analysis of that element turned on factual issues. The plaintiffs misunderstand this court's jurisdiction. They rely on case law concerning the summary judgment standard of review where the district court has found a genuine issue of material fact. Here, the district court reviewed a motion to dismiss, accepting well-pled factual allegations as true. *See Heyne v. Metro. Nashville Pub. Schs*, 655 F.3d 556, 562 (6th Cir. 2011). We have jurisdiction to consider all aspects of the qualified immunity analysis. *Courtright v. City of Battle Creek*, 839 F.3d 513, 517–18 (6th Cir. 2016).

*Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (quoting *Williams ex rel. Allen v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004)).

The facts, taken as true and construed in the plaintiffs' favor, support the inference that Zimmerman and Jones erroneously advised the RCSO that the plaintiffs were selling illegal CBD products even though the prosecutors knew or should have known that they had no evidence of the products' illegality. Zimmerman's December 2017 email to TBI employees seeking clarification about the lab results implies that he did not, at least at that time, have probable cause to arrest the plaintiffs. Yet, even though the TBI claims it clarified that it could not determine whether the products were illegal, Zimmerman continued to direct the investigation and push Operation Candy Crush forward. Similarly, Jones's late January 2018 email to Sharp and Zimmerman about the TBI potentially not corroborating the illegality of the products suggests that he also knew they lacked probable cause for the arrests throughout the investigation.[9] Jones and Zimmerman pushed law enforcement to effectuate the arrests by providing unsupported advice that the CBD products were illegal and there was probable cause to arrest the plaintiffs. The plaintiffs thus adequately allege a constitutional violation.

We next consider whether a reasonable official would have known that Jones and Zimmerman's alleged conduct violated a clearly established federal right. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). On a general level, "[i]t is clearly established that an arrest without probable cause violates the Fourth Amendment." *Crockett v. Cumberland College*, 316 F.3d 571, 584 (6th Cir. 2003) (alteration in original) (citing *Donovan v. Thames*, 105 F.3d 291, 297–98 (6th Cir. 1997)). More specifically, however, we must ask whether reasonable officials—armed with the information that was available to Jones and Zimmerman at the time of their alleged conduct—would have believed that probable cause existed to arrest the plaintiffs. *See Ireland*, 113 F.3d at 1448–49 (explaining that qualified immunity applies if reasonable officers could disagree as to the existence of probable cause); *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008) (considering the "totality of the information" that was known

---

[9]Contrary to Zimmerman's claims, the grand jury indictments, which were allegedly based on false information, do not conclusively establish probable cause. *See King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017) (holding that "the presumption that [a] grand-jury indictment is evidence of probable cause is rebuttable and not conclusive" when law enforcement presents false information in attaining that indictment).

to officials at the time of arrest).  It is clearly established that prosecutors may not make a probable cause determination based on unreliable evidence.  *See Harris*, 513 F.3d at 512. Moreover, a probable cause finding may not be based on "information too vague and from too untested a source."  *Wong Sun v. United States*, 371 U.S. 471, 482 (1963).  If "no reasonably competent officer would have concluded" that probable cause existed, qualified immunity does not apply.  *Howell v. Sanders*, 668 F.3d 344, 354 (6th Cir. 2012) (quoting *Ireland*, 113 F.3d at 1448).

Jones and Zimmerman's actions were objectively unreasonable because their probable cause determinations rested on the inconclusive results in the TBI reports.  It is unreasonable to submit an innocuous product to a lab test that is incapable of determining its legality, then rely on that inconclusive evidence to say that the substance was probably illegal.  According to the TBI statement—which is corroborated by RCSO officers and, in any case, presumed to be true— Jones and Zimmerman were explicitly informed that the TBI lab reports could not determine the origin of the products or their THC percentages.  Meanwhile, the relevant Tennessee statutes, by their plain language, did not criminalize CBD products that were hemp-derived and had less than 0.3% THC.  Tenn. Code Ann. § 43-26-102(4).  Without information regarding origin and THC percentage, the TBI could not and would not establish that the plaintiffs' CBD products were illegal.

A reasonable officer would know that the mere presence of CBD in products, without any indication as to the products' origin or THC percentage, did not provide probable cause for violations of Tennessee's controlled-substance laws.  Concluding otherwise was objectively unreasonable.  Therefore, we affirm the district court's denial of qualified immunity for Jones and Zimmerman.

## B.

Fitzhugh claims he is entitled to quasi-judicial absolute immunity and qualified immunity for advancing, authorizing, and participating in Operation Candy Crush.  While quasi-judicial immunity protects actions taken pursuant to a valid court order, Fitzhugh has not justified extending quasi-judicial immunity to the execution of a tainted court order based on false

information.   The plaintiffs, moreover, have alleged sufficient facts to show Fitzhugh is not entitled to qualified immunity for their Fourth Amendment claims; Fitzhugh was objectively unreasonable in determining that probable cause existed despite being briefed on the issue. Regarding the equal protection claim, however, the complaint does not allege facts to indicate Fitzhugh was involved in the decision to selectively investigate and prosecute the plaintiffs' stores rather than larger retailers; the complaint thus fails to allege an equal protection violation by Fitzhugh and he is entitled to qualified immunity on that claim.

1.

Quasi-judicial immunity extends to "[o]ne who acts as the judge's designee, and who carries out a function for which the judge is immune." *Johnson v. Turner*, 125 F.3d 324, 333 (6th Cir. 1997) (citations omitted).  The task must be "so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994) (citation omitted).  This court has held that an official is protected by absolute quasi-judicial immunity when he acts pursuant to a *valid* court order because "enforcing or executing a court order is intrinsically associated with a judicial proceeding." *Cooper v. Parrish*, 203 F.3d 937, 948 (6th Cir. 2000) (quoting *Bush*, 38 F.3d at 847).

Fitzhugh's actions—arresting the plaintiffs, seizing their property, and locking their shops after receiving a court order—are not entitled to absolute immunity.[10]  The plaintiffs allege that the court order was tainted by false information and thus Fitzhugh is not entitled to absolute immunity for these actions.  The plaintiffs allege several false statements in the petitions and affidavits filed in support of grand jury indictments and nuisance orders.  For example, the petitions claimed that "marijuana extracts" were "laced" into edible products, and the affidavits stated that the TBI corroborated this claim.  This was false.  Moreover, the plaintiffs highlight an

---

[10]It is clear that Fitzhugh is not entitled to absolute immunity for his actions prior to the execution of Operation Candy Crush, including his discussions with Jones, Zimmerman, and Sharp regarding the investigation and his alleged role in directing the investigation and executing Operation Candy Crush. *See Malley v. Briggs*, 475 U.S. 335, 340–41 (1986); *Spurlock v. Satterfield*, 167 F.3d 995, 1003 (6th Cir. 1999).  As explained previously, the actions taken during the investigation phase of Operation Candy Crush were purely investigative and administrative, and not directed by a judicial officer.

affidavit in one case that included the TBI lab report's "Schedule VI" determination and claim officials did not inform the court that the report had been amended to remove the scheduling notation. Because Fitzhugh has not made any argument on appeal justifying why absolute immunity should extend to his execution of a tainted court order, he has waived the argument and failed to meet his burden. *See Burns*, 500 U.S. at 486 (noting that officials asserting absolute immunity bear the burden of demonstrating that absolute immunity is justified for their conduct at issue).

2.

Fitzhugh claims he is entitled to qualified immunity with respect to the plaintiffs' Fourth and Fourteenth Amendment claims. The district court denied Fitzhugh qualified immunity by reasoning that the complaint sufficiently stated a claim against Fitzhugh for a constitutional violation and that Fitzhugh "knew or reasonably should have known that the plaintiffs' arrests were being effected without probable cause." DE 59, Mem. Order, PageID 442. We agree and hold that Fitzhugh is not entitled to qualified immunity with respect to the unlawful arrest claim, but we reverse and hold Fitzhugh is entitled to qualified immunity on the equal protection claim.

The plaintiffs first allege that Fitzhugh violated their Fourth Amendment rights to be free from arrest without probable cause and malicious prosecution. Their primary argument is that Fitzhugh did not have probable cause to seize and arrest them, nor to influence the decision to prosecute them.

"Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley*, 475 U.S. at 341. In *Greene v. Reeves*, for example, this court held that law enforcement officials were entitled to qualified immunity for wrongly concluding that a warrant should issue against a couple for their suspected violation of Kentucky's child pornography laws. 80 F.3d 1101, 1103 (6th Cir. 1996). The court's reasoning highlighted the "vagueness and breadth" of Kentucky's child pornography laws and that multiple entities—including a postal worker, police detective, prosecutor, judge, and grand jury—expressed concern over the couple's conduct. *Id.* at 1106–07.

Additionally, "individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has 'made, influenced, or participated in the decision to prosecute the plaintiff' by, for example, 'knowingly or recklessly' making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants." *King v. Harwood*, 852 F.3d 568, 582–83 (6th Cir. 2017) (quoting *Webb v. United States*, 789 F.3d 647, 660, 665 (6th Cir. 2015)). "[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock*, 167 F.3d at 1006 (citation omitted).

The plaintiffs adequately allege Fitzhugh violated a clearly established constitutional right based on his objectively unreasonable belief that probable cause existed to arrest the plaintiffs. Although Fitzhugh's role in the investigation was less direct than that of Jones and Zimmerman, the complaint alleges that he knew the RSCO officers' legitimate concerns about the CBD products' supposed illegality and nevertheless assisted in the execution of Operation Candy Crush. Unlike the vague statutes in *Greene*, Tennessee and federal law was clear—hemp-derived CBD products within a certain THC percentage were legal. The TBI informed RCSO officers that it could not test for origin or THC percentage. RCSO officers informed Sharp that the TBI could therefore not determine legality, and Sharp then briefed Fitzhugh on these concerns and his decision to postpone the investigation. The extent and details of this briefing are unclear, but, drawing reasonable inferences from the complaint in the plaintiffs' favor, we may infer that Sharp informed Fitzhugh of the most critical obstacle to probable cause: the TBI's inability to determine these products were illegal.

Similarly, the plaintiffs adequately allege that Fitzhugh influenced or participated in the malicious prosecution of the plaintiffs in violation of their clearly established rights. While prosecutors, police, and other entities in *Greene* expressed concern regarding the potential illegal conduct in that case, the prosecutors here were the only individuals that described the CBD products as illegal. RCSO officers consistently and repeatedly pushed back against the notion that the CBD products at issue were illegal, and forensic analysts at the TBI refused to label the products as illegal. After Fitzhugh's subordinate RCSO officers decided to postpone the

investigation, Fitzhugh nevertheless "influenced[] or participated in the decision to prosecute the plaintiff[s]" by arranging meetings between RCSO officers and prosecutors which were meant to push Operation Candy Crush forward, and he ultimately helped carry out the arrests. *King*, 852 F.3d at 582. Fitzhugh did so despite the exculpatory information regarding the TBI's testing limitations that countered any probable cause determination. *See Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999) ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone."). Given the current motion to dismiss context, the plaintiffs sufficiently allege Fitzhugh had direct knowledge of this exculpatory information and ignored it.

In fact, the only justifications Fitzhugh offered for the arrests were allegedly fabrications. He claimed the plaintiffs would take candies out of their packaging, "spray them" with an illegal substance, and repackage them for sale. DE 44, SAC, PageID 322. He also claimed the products were derived from marijuana, even though the TBI never indicated—because it could not test— whether the products were derived from hemp or marijuana. Similar false statements were made in securing the indictments and nuisance orders. Although Fitzhugh made his false comments in a press conference after the plaintiffs were already arrested, they suggest he conducted himself in the investigation with a reckless disregard for the truth—a truth of which he was likely aware, based on the complaint's allegations about communications from his subordinates and the TBI. Thus, Fitzhugh is not entitled to qualified immunity for the alleged unlawful arrests, seizures, and malicious prosecution against the plaintiffs.

The plaintiffs also allege that Fitzhugh violated their equal protection rights because Operation Candy Crush selectively targeted them as small businesses, as compared to nationwide retailers like Amazon or Walmart that sold similar products, because the defendants believed the plaintiffs would be more likely to pay baseless fines and forfeit property in order to avoid costly litigation.

To state a claim of selective prosecution, the plaintiffs must demonstrate three elements: "First, [the state actor] must single out a person belonging to an identifiable group . . . for prosecution even though he has decided not to prosecute persons not belonging to that group in

similar situations.    Second, he must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the *group* which the defendant belongs to." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (first alteration in original) (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir. 1991)).

The complaint fails to allege a selective enforcement claim against Fitzhugh because it does not show Fitzhugh was responsible for the decision to selectively prosecute the plaintiffs. The complaint alleges that Zimmerman instructed officers not to go after stores like Amazon, and that Zimmerman—seeking to execute Operation Candy Crush before laws were enacted restricting the government's ability to financially collect from the plaintiffs—commented on the plaintiffs' willingness to pay fines, plead guilty, or settle. Although the plaintiffs sufficiently allege that the investigation improperly targeted them based on malicious, financial intent, the complaint does not suggest that Fitzhugh shared Zimmerman's intent or otherwise instructed officers in this regard. Fitzhugh was not present in the meetings where these comments were made. Even if RCSO officers acted pursuant to Zimmerman's discriminatory intent, Fitzhugh would not be liable for the constitutional violations of his subordinates. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (noting that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*") (citations omitted).

Moreover, assuming Fitzhugh *was* involved in the decision of which store owners to target, he asserts that "police resources are limited, and [] only a fraction of those guilty of criminal activity can be prosecuted." No. 19-5347, CA6 R. 27, Fitzhugh Reply Br., PageID 18. Selective prosecution based on limited police resources defeats a selective enforcement claim. *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004). Thus, the complaint does not demonstrate that Fitzhugh violated the plaintiffs' constitutional rights of equal protection. Accordingly, Fitzhugh is entitled to qualified immunity on this claim.

IV.

For the reasons above, we affirm the district court's denial of absolute and qualified immunity for Jones and Zimmerman, affirm the district court's denial of quasi-judicial and

qualified immunity for Fitzhugh on the Fourth Amendment claim, and reverse the denial of qualified immunity for Fitzhugh on the plaintiffs' equal protection claim.